## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANNTWANETTE JONES and LUCINDA ALLARD, *individually, and on behalf of a class of similarly situated persons*, | Case No. 1:23-cv-1040 |
| Plaintiffs, | |
| v. | **COMPLAINT – CLASS ACTION** |
| PHH MORTGAGE CORPORATION D/B/A PHH MORTGAGE SERVICES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Anntwanette Jones and Lucinda Allard individually (collectively "Plaintiffs") and on behalf of all others similarly situated, bring this class action against Defendant PHH Corporation d/b/a PHH Mortgage Services ("PHH"), alleging (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) violations of New York General Business Law § 349; (4) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1 *et seq.*; and (5) unjust enrichment.

As set forth in Paragraphs 8-10, there is diversity jurisdiction over Plaintiffs' claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

## NATURE OF THE ACTION

1.      PHH is one of the country's largest servicers of residential mortgages and has for years raked in millions of dollars in profit by unfairly and illegally up-charging borrowers for routine mortgage servicing activities. While PHH saves money—and therefore increases its profits—when it can persuade borrowers to remit payment using various methods of electronic

funds transfers ("EFTs") instead of by check, PHH has chosen to take advantage of the fact that borrowers cannot choose their mortgage servicer and are captive audiences for a profit center. While PHH currently permits borrowers to pay via a pre-authorized, reoccurring EFT transaction over the ACH network without a charge, PHH tacks on egregious "convenience fees" or "processing fees" (collectively, "Pay-to-Pay Fees") of up to $19.50 for borrowers who elect to remit that same payment on a monthly basis instead.

2.      These Pay-to-Pay Fees are not authorized in borrowers' mortgage agreements and are often prohibited under various state and federal laws and regulations. Many of PHH's borrowers obtain loans through the Federal Housing Administration ("FHA"), which insures loans for lower income borrowers. In exchange for government insurance, loan servicers must agree to adhere to the FHA's regulatory scheme, which does not permit arbitrary and unreasonable costs be imposed on borrowers. PHH ignores these rules and charges these FHA borrowers the illegal and unapproved fees anyway.

3.      Because mortgage servicers save money when they agree to accept payment via EFT, most mortgage servicers offer these payment methods free of charge. Indeed, the actual cost for PHH to process any kind of EFT transaction is far less than the cost to process a traditional check payment. EFTs are so much more efficient and cheaper for servicers that when PHH receives a check by mail, it often simply keys in the account and routing numbers and processes the payment as an EFT. Of course, that method still costs PHH more than when the borrower simply enters their payment information in themselves online or over the phone, but PHH has nevertheless decided to overcharge its captive borrowers who do its job for it.

4.      Unfortunately, borrowers do not have the right to select their loan servicer and obtain a better deal; rather, their creditors made the decision to assign servicing rights to PHH. So

2

those borrowers who prefer the added control and protection provided when one authorizes the EFT payment on a monthly basis rather than paying by check or a preauthorized, reoccurring EFT cannot switch to those providers, and must accept PHH's outrageous fee schedule. Meanwhile, these borrowers are already compensating PHH for its servicing work; the interest and other fees paid as part of the mortgage loan are intended to cover all the costs associated with servicing it. To that end, the creditor pays PHH monthly service fees for each mortgage it processes. Nevertheless, PHH still chooses to mark up its costs of processing certain EFTs far above the actual cost and impose Pay-to-Pay Fees on borrowers to create a profit center for itself.

5.       PHH has long known that its Pay-to-Pay Fees are problematic. Federal and state regulators have criticized the practice, and PHH has been subjected to many lawsuits over it. While other mortgage servicers have agreed to stop charging the fees (or never charged them in the first instance), PHH has aggressively sought out ways to force these fees on borrowers. In recognition of the fact that the fees are not otherwise permitted by contract or law, PHH has recently started to try to force some borrowers to agree to amend their mortgages to permit PHH to extract these fees. But PHH's proposed note amendment goes far beyond merely allowing it to charge a fee for a singular transaction. Rather, to obtain the right to have one payment processed via a standard EFT, PHH has begun trying to force some borrowers to permanently modify their mortgage agreements to permit PHH to charge the borrower up to $19.50 each time the borrower elects to pay in a method not specifically provided for in the borrower's original note agreement for the duration of the mortgage agreement. Because the **only** method specifically provided for in the original note agreement is payment via check or money order, ***PHH's amendment allows PHH to charge borrowers who elect a recurring, pre-authorized automatic ACH debit from their bank account $19.50 a month for the entire duration of the mortgage.*** Thus, under PHH's proposed note

amendment, a borrower who has a temporary financial setback but who wishes to preserve their credit and avoid a late fee, and elect to pay via a standard EFT, would only be able to do so if they agree to permit PHH broad rights to impose new and exorbitant fees for decades on the most routine payment methods.

6.    PHH claims that it offers borrowers payment choices to which they would not otherwise be entitled, and for that, it has a right to charge whatever fees it wants. But PHH is required to accept payment by check and has no legal entitlement to receive payment any other way. It only offers various EFT options because those options save PHH money. And it imposes charges on the standard EFT payments because it has figured out that the borrowers most likely to elect that option tend to be borrowers who live on tighter budgets and are least able to absorb this added cost, but do so to avoid adverse credit reporting, overdraft charges, late fees, or other financial consequences. In criticizing this practice recently, a group of eleven state attorneys general explained, "simply choosing the less bad option doesn't mean that the consumer really has a choice."

7.    Plaintiffs paid these Pay-to-Pay Fees and they bring this class action lawsuit individually and on behalf of all similarly situated putative class members, to recover the unlawfully charged Pay-to-Pay Fees and to enjoin PHH from continuing to charge these unlawful fees.

## **JURISDICTION AND VENUE**

8.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because diversity exists between PHH and at least one class member and the matter in controversy exceeds $5,000,000.

9.     This Court has personal jurisdiction because PHH is a New Jersey citizen as it is a New Jersey corporation, and commits torts in New Jersey, as described in this Complaint.

10.     Venue is proper because a substantial portion of the events alleged herein occurred within this District.

**PARTIES**

11.     Plaintiff Anntwanette Jones (individually, "Plaintiff Jones") is a natural person residing in Amherst, New York, who has an FHA mortgage loan serviced and/or subserviced by PHH. A copy of her mortgage agreement is attached hereto as Exhibit A.

12.     Plaintiff Lucinda Allard (individually, "Plaintiff Allard") is a natural person residing in Chatham, Illinois, who has a mortgage loan serviced and/or subserviced by PHH. A copy of her mortgage agreement is attached hereto as Exhibit B.

13.     PHH is incorporated in and has its principal place of business in the State of New Jersey and is thus a citizen of the State of New Jersey.

14.     PHH enters into service agreements with lenders, note holders, master-servicers and trustees pursuant to which PHH provides servicing, subservicing, and agency activities for loan portfolios. Pursuant to its agreements with lenders, note holders, master-servicers, and trustees, PHH (a) acts as the agent to the lenders, note holders, master-servicers, and trustees, and (b) exercises the rights and responsibilities of those lenders, note holders, and master-servicers pursuant to their approval. In this manner, PHH either takes assignment of the servicing obligations in borrowers' loan agreements, and/or is in functional privity and near privity of contract with Plaintiffs and Class members, tasked with performing many of the obligations assumed by the lenders and/or note holders to Plaintiffs' and Class members' loan agreements.

5

15.    PHH often performs subservicing in which it performs its servicing duties under the name of master-servicer or lender. A borrower may not even realize that PHH is sub-servicing their loan as the master-servicer's name and logo appears prominently on the monthly statement and other correspondence while PHH's name may appear as "c/o PHH Mortgage Services" smaller font. However, PHH is responsible for interacting with borrowers, and processing payments. PHH does not disclose the terms of its servicing agreements publicly.

16.    PHH represents in standard, form letters to Plaintiffs and other borrowers that, "PHH Mortgage Services will perform all servicing activities for your mortgage loan." PHH mails standard, form mortgage statements and notice letters to Plaintiffs and Class members with the approval and authority of its lender, note holder, and/or trustee principals.

## STATEMENT OF FACTS

**A.    Overview of the Residential Mortgage Lending and Servicing Industry**

17.    The residential mortgage lending industry is generally divided between two types of loans: conforming and non-conforming. The vast majority of loans are "conforming" loans, in that they "conform" with particular uniform terms and conditions, and are for amounts under a certain threshold, set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association (FNMA or Fannie Mae) and the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac). FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises (GSEs). In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

18.     Conforming loans include both government loans (i.e., those insured by the Federal Housing Administration ("FHA"), Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. While certain government loans differ from conventional loans in a few ways, all conforming loans must nevertheless "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market. To ensure ease of securitization, the GSEs create standard promissory notes and deed of trust/mortgage templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections to incorporate any state requirements, this process too relies on standardized language.

19.     As a result, the consumers who buy residential properties using a conforming mortgage loan do so through a standardized, regulated process, regardless of the lender or type of conforming loan obtained. These borrowers' transactions are memorialized in two standardized documents, a deed of trust/mortgage and note (collectively "Standard Mortgage Agreements" or "Standard Mortgages"). Every few years, the GSEs and government agencies make minor modifications to select paragraphs in the templates that lenders are to use, but the templates are otherwise consistent. Examples of government and conventional Standard Mortgage Agreements are attached as Exhibits A and B, respectively.

20.     Because the agreements cannot be bundled with one another if they are not standardized, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents. Because the GSEs will accept for securitization only those

loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

### 1. Mortgage Holders Delegate Rights and Responsibilities to Mortgage Servicers.

21.     After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage to the GSEs, which in turn bundle it with other conforming loans to sell as securities to investors in the form of a mortgage-backed security—a bond-like security that is secured by the mortgaged property. While the original mortgage lender may itself service the securitized and pooled loan, often that lender or the GSEs to which the loan is sold (collectively "Holders") will assign a large mortgage servicing company the rights to service the mortgages. That company may in turn contract with one or multiple subservicers. These servicers (whether master servicers or subservicers (collectively "Servicing Companies")) specialize in the management and administration of mortgages and perform the servicing obligations required by the Standard Mortgages.

22.     As part of this process, the Holder assigns the servicer various rights and responsibilities under the standard mortgage agreements, and the servicer and the Holder negotiate a fee schedule under which the Holder will compensate the servicer for collecting payments and other servicing and collections work. Where a servicer enlists a subservicer, the same process applies. As a result, rather than paying the Holder directly, borrowers are instructed to submit their mortgage payments to a Servicing Company, who later splits those payments between itself, any master servicer involved, and the Holder pursuant to the agreed upon fee schedule.

23.     The Servicing Companies get compensated in two key ways. *First,* as with any loan, a portion of the interest a borrower pays on their mortgage goes to cover the cost of collecting

8

that loan, and Servicing Companies negotiate a servicing fee for each mortgage serviced. The servicing fee is typically a fixed percentage of the borrower's outstanding mortgage balance on an annual basis, usually in the .25-.5% range. For example, if a Servicing Company agrees to perform work for .5% of the borrowers' balance, and a borrower has a $223,952 balance on their mortgage (which was the average mortgage balance in the United States at the end of 2021),[1] the Servicing Company receives $1,119.76 a year, or $93.31 a month, to accept the payment from the borrower and apply it to the balance. ***Second,*** the Holder the servicing company to which it assigns servicing rights can agree to a fee schedule by which other incidental revenue from the borrower gets allocated between them. For example, the standard mortgage agreement specifies certain kinds of fees, such as late fees, and these agreements usually specify which party (i.e., the Holder or the servicer) can keep those fees. Likewise, the various companies involved may agree as to how interest on borrowers' escrow payments is shared.

24.     The borrower has no role in the selection of the Servicing Companies or the way any company in the chain agree to split fees. Because the borrower's payment obligations are set out in the standard mortgage agreement, the borrower's out-of-pocket costs, in theory, should not be impacted by the Holder's choice of servicer and the involvement of any subservicer. And the standard mortgage agreement does not impose any obligation to pay for loan servicing beyond the mortgage payment, interest, and certain limited fees.

### 2.     The Servicing of FHA Mortgages is Subject to Additional Regulatory Oversight.

25.     One type of government backed conforming mortgage are those backed by the FHA, an agency within the United States Department of Housing and Urban Development

---

[1] https://www.experian.com/blogs/ask-experian/how-mortgage-debt-has-rose-over-last-5-years/

("HUD"). The FHA "provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories." The FHA "is the largest insurer of mortgages in the world, insuring over 47.5 million properties since its inception in 1934."

26.     A lender's choice to avail itself of the benefit of the federal guarantee, however, comes with an obligation to service insured mortgages in full compliance with FHA's servicing rules, which are codified as law at 24 C.F.R. Subpart C, Part 203. Because the lenders bear less risk, they are obligated to adhere to the regulatory scheme to protect the government's investment, i.e., minimize the risk of borrower default. In particular, the regulations require the "mortgagee," broadly defined to include the Lender, Holder, and Servicer, 24 C.F.R. § 203.251, to adhere to HUD's servicing regulations "with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage." 24 C.F.R. § 203.257. Additionally, HUD publishes a Single-Family Housing Handbook, which contains additional detail and instructions on how to comply with its regulations. Handbook 4000.1 (issued Jan. 18, 2023), available at https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh-011823.pdf (the "HUD Servicing Policy").

27.     One way the FHA enforces its regulatory scheme is through uniform security instruments (notes and deeds of trust/mortgages)[2] that contain standard terms. *See* 24 C.F.R. § 203.17 (mortgage must be in form defined by HUD Commissioner or contain specific terms authorized by Commissioner). Rather than allowing lenders to use their own potentially individualized mortgage agreements, the FHA requires lenders to use its version of the Standard Mortgage Agreement.

---

[2] The contract used to secure the promissory note is referred to as either a deed of trust or mortgage depending on state law.

28.     As part of its regulatory scheme, HUD has promulgated a series of regulations to "identif[y] servicing practices of lending institutions that HUD considers acceptable for mortgages insured by HUD." 24 C.F.R. § 203.500.[3] *See also generally id.* at §§ 203.500-203.681 ("Servicing Regulations").

29.     Included in the Servicing Regulations are specific instructions setting forth the fees and charges that Holders and servicers may collect from borrowers. Specifically, HUD requires that a "mortgagee may collect reasonable and customary fees and charges from the mortgagor after insurance endorsement *only* as provided below." 24 C.F.R. § 203.552 (emphasis added) ("Approved Fees Regulation"). This Regulation identifies thirteen specific types of charges, *see generally* 24 C.F.R. § 203.552(a), and one narrow category of charges, i.e., those "other reasonable and customary charges as may be authorized by the Secretary." 24 C.F.R. § 203.552(a)(12) (emphasis added). The Regulation, however, limits what charges the Secretary may authorize, stating that these other charges "shall not include…[c]harges for servicing activities of the mortgagee or servicer." *Id.* 24 C.F.R. § 203.552(a)(12)(i).

30.     The HUD Servicing Policy reinforces the language in the Approved Fee Regulation. It states that lenders: may collect certain reasonable and customary fees and charges from the Borrower after the Mortgage is insured and as authorized by HUD below. All fees must be: reasonable and customary for the local jurisdiction based on the actual cost of the work performed or actual out-of-pocket expenses and not a percentage of either the face amount or the unpaid principal balance of the Mortgage; ***and*** within the maximum amount allowed by HUD.

---

[3] The FHA Handbook similarly makes clear that "[t]he Mortgagee must fully comply with all of the following standards and procedures when servicing a Mortgage insured by the Federal Housing Administration." HUD Servicing Policy § III.A.

HUD Servicing Policy at § III.A.1.f.ii. In other words, lenders may only collect fees that are authorized by HUD, and fees that are authorized by HUD are only those fees that meet all three of the specified criteria. Importantly, the fees must be tied to the actual costs or expenses incurred by the Holder or servicer.

31.     To determine "the maximum amount allowed by HUD" for a fee, a lender must consult Appendix 3.0 of the HUD Servicing Policy, which contains an exhaustive list of the servicing fees and charges authorized by HUD and the maximum amounts that may be charged for such fees. Appendix 3.0 does not list any fees for processing payments other than fees for returned checks.

32.     The HUD Servicing Policy further states "The Mortgagee must not charge the Borrower" for "costs of telephone calls personal visits with the Borrower, certified mail, or other activities that are normally considered a part of a prudent Mortgagee's servicing activity." HUD Servicing Policy at § III.A.1.f.ii.(B).

33.     The Standard Mortgage Agreements for FHA borrowers is informed by the Approved Fee Regulation, as well as the Servicing Regulations. In particular, since approximately 2017, these Agreements have stated:

> **13. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary [of Housing and Urban Development]. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

*See, e.g.*, Ex. A at § 13.[4] The Standard Mortgage Agreements for FHA borrowers does not specifically itemize the fees that HUD has approved and prohibited; rather, the Agreements contemplate that the contracting parties (i.e., the lenders, Servicing Companies, and borrowers) will refer to the Approved Fee Regulation and implementing policy documents, including the Servicing Handbook to understand what fees can be charged.

**B.      PHH is a Residential Mortgage Servicer That Charges Illegal and Unfair Pay-to-Pay Fees.**

34.      PHH is a Servicing Company, providing both servicing and subservicing of conforming, residential mortgages, and operates nationwide. PHH buys mortgage servicing rights or contracts and exercises those mortgage servicing rights to collect mortgage payments, charge fees, enforce the mortgage or deed of trust and note, as well as initiate foreclosure on properties that secure the mortgage or deed of trust and note.

35.      As part of PHH's regular business practice of acquiring servicing rights to mortgages, it acquires mortgages in default for purposes of servicing them, including collecting payments on that mortgage debt both during the time the mortgage is in default and after it has been brought current.

36.      PHH also regularly services FHA mortgages and is a "mortgagee" within the meaning of the HUD regulatory scheme. In so doing, PHH must annually "acknowledge that the Mortgagee is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 C.F.R

---

[4] The language prior to 2017 was substantially similar, except that the last sentence was not included.

13

§ 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act), and Title VI of the Civil Rights Act of 1964."

     1.     **PHH Has Legal Obligations and Financial Incentives to Offer Consumers Various Ways to Remit Payment.**

37.     As a Servicing Company, one of PHH's major responsibilities is to accept mortgage payments. The Standard Mortgage Agreements require the Holder or Servicer to accept payment via check or money order at a designated location.

38.     While PHH, like all Servicing Companies, is required to accept payments by check under the Standard Mortgage Agreements, accepting payments in this form is expensive. It can cost anywhere between $1 and $4 a month in processing and other fees, per a 2015 report by the Association for Financial Professionals. Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited. Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.

39.     Because of the costs associated with accepting paper checks, Servicing Companies earn more money per payment if they can persuade borrowers to remit payment via electronic funds transfer, which often costs as little as only a few cents. Generally, EFTs take two main forms.

40.     ***First,*** EFTs may be pre-authorized, reoccurring EFTs, whereby the borrower authorizes the Servicing Company to debit each month a pre-determined amount of money from their account on a pre-determined date. This form of payment typically costs Servicing Companies a few cents per transaction. While Servicing Companies may accept payment in this manner, they

are prohibited from requiring borrowers to repay their mortgages in this manner. The federal Electronic Funds Transfer Act prohibits lenders from "condition[ing] the extension of credit" on a borrower's willingness to repay the loan "by means of preauthorized electronic fund transfers." 15 U.S.C § 1693k(1).

41.     **Second,** EFTs may be standard EFTs, whereby the borrower authorizes only a single debit at a time. A borrower paying via standard EFT could remit payment via electronic funds transfer on the date of their choosing by using a payment form on the Servicers' website, phone, or via an interactive voice recorded ("IVR") phone call, through which a borrower can provide bank account information and authorize the electronic payment. Standard EFTs typically cost Servicing Companies like PHH less than 50 cents a transaction, far less than the cost of paying by check, and like the pre-authorized EFTs, includes increased electronic efficiencies. The Association for Financial Professionals wrote a report in 2015 stating that the median cost for processing these transactions was between 37 and 75 cents, much less than its estimated check processing costs of $1 to $4.

42.     While PHH, like all Servicing Companies, saves the most money, and thus, profits more, when borrowers agree to submit payment via pre-authorized EFTs, it knows that it cannot mandate that borrowers pay this way. And PHH knows that many borrowers will find pre-authorized reoccurring EFTs inconvenient or impractical, as it requires that one agree to a fixed amount and date for the debit each month out of a pre-determined bank account, and increases a borrower's vulnerability to banking errors. Many borrowers have various budgetary needs that cause them to need more control over their finances. For example, borrowers are often paid on different dates of a given month, and since there is a fifteen-day grace period before a monthly payment is deemed late, borrowers may need to make their monthly payment on a schedule that

coincides with their paydays, which may not be the same calendar day each month. Some may pay extra on their mortgage at times and need to make that decision on a monthly basis. Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

43.    Because the cost of accepting paper checks is high, and accepting payment via EFT is low, Servicing Companies, including PHH, can reduce costs and increase profits if they can persuade the group of borrowers who do not consent to pre-authorized EFTs to pay via standard EFTs instead of by check. Thus, many servicers, including PHH, offer borrowers the option of authorizing payment via a standard EFT on a month-by-month basis.

### 2.    PHH Illegally and Unfairly Double-Charges Consumers When They Remit Payment Online or Over the Phone.

44.    While PHH already profits when it persuades borrowers to pay in ways that do not require PHH to process a check, PHH exploits borrowers' financial vulnerabilities by charging borrowers to process their own transactions at a huge markup. Each time a borrower whose loan is serviced by PHH makes a payment via standard EFT, PHH charges the borrower a Pay-to-Pay Fee of up to $19.50, but often at least $7.50.

45.    These Pay-to-Pay Fees are materially higher than the costs incurred by PHH, and can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits for PHH. PHH's imposition of Pay-to-Pay Fees also amounts to a form of double-charging. It charges the Pay-to-Pay Fees over and above its negotiated servicing fees agreed with the Holder and any master servicer.

46.    When PHH negotiates a servicing fee, it does so knowing that (1) it cannot require any borrower to remit payments exclusively by a pre-authorized EFT; and (2) it may have to incur

the higher cost of payment by check for every single borrower whose account PHH services. Thus, when negotiating and charging a given service fee, PHH knows that it must charge a rate that is high enough to cover its servicing costs, including the costs of accepting payment by check, while allowing it to turn a profit. Using the example in paragraph 23, where PHH negotiates a .5% servicing fee, the borrower of an average U.S. mortgage compensates PHH $93.31 a month to accept their payment, regardless of how they remit payment. In that instance, should the borrower invoke their right to pay by check, PHH could incur as much as $4 in costs to process check payments, leaving $89.31 to cover other overhead costs and for its own profit. By offering the borrower the option to pay via a standard EFT, PHH can keep a few more dollars of the borrower's money. But PHH goes one step further. It *also* charges the borrower extra fees—of up to $19.50 per payment—when they make the payment.

47.    PHH has admitted that it retains portions of the Pay-to-Pay Fees and that the fees it collects exceeds "the costs of processing such payments or making such payment methods available." Ex. C, Allard Proposed Note Amendment ¶ 2.

48.    As to FHA borrowers, the Pay-to-Pay Fees that PHH collects are in violation of those borrowers' mortgage agreements, as well as of the HUD Servicing Regulations. In particular, Pay-to-Pay Fees do not appear on the list of approved fees in the Approved Fee Regulation. Rather, the Approved Fee Regulation prohibits the Secretary from authorizing "[c]harges for servicing activities," 24 C.F.R. § 203.552(a)(12)(i), which Pay-to-Pay Fees are. The Pay-to-Pay Fees further violate that regulation and the policies set forth in the Servicing Handbook, as they are neither reasonable nor customary. Most Servicers do not charge these fees. And they are not reasonable, as the fees exceed PHH's out-of-pocket costs by as much as several hundred percent. Moreover, because the Pay-to-Pay Fees are both a cost in connection with a telephone call, and not included

on Appendix 3.0, they, are not authorized, even if they are based on actual cost of work and are reasonable and customary for the given geographic region.

49.    PHH's fees also violate a New York statute that regulates mortgage servicers. In particular, New York law provides that "[a] servicer may only collect a fee if it is for a service that is actually rendered to the borrower, reasonably related to the cost of rendering that service." 3 N.Y.C.R.R. § 419.5(b). PHH's steep fees of $7.50 to $19.50 are not reasonably related to the cost of rendering the service, which is significantly less.

50.    PHH may purport to be providing a valuable service to borrowers to which they would not otherwise be entitled. But PHH has no incentive to stop offering standard EFTs to borrowers, because if it did, PHH would have to process more checks at a much higher cost.

51.    PHH's preference for processing payments via standard EFT rather than via a paper check is plain from its own instructions to borrowers in monthly statements. PHH admits that it may not actually process the checks it receives as checks, but rather, converts them to a *standard EFT*:

> When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account, or to process the payment as a check transaction. . . . If you would like to opt out of this program or if you have any questions, please call us at the phone number shown on the front of this statement.

In other words, PHH does not deposit the check at its bank and then wait several days for the check to clear. Rather, when a borrower mails it a check, PHH uses the borrower's bank account number and routing number on the bottom of the check to electronically debit the borrower's bank account over the ACH network, resulting in the payment clearing in about a day.

52.    Because processing a check as an EFT transaction will clear faster, it is less likely to incur the customer service costs associated with the acceptance of checks, and thus is less

expensive, but because there is still some delay time and more risk of human error, this method is still more expensive than processing a standard borrower-initiated EFT. It is implausible that PHH would stop allowing borrowers to enter their bank account information if it could not charge them to do so, and instead assume the added expense of doing that work itself. For example, although PHH agreed, in settling a similar class action lawsuit involving California borrowers, to cease charging those borrowers Pay-to-Pay Fees, it continues to offer those borrowers the option of paying via standard EFT (free of charge), presumably because allowing customers this payment option is financially beneficial for PHH.

53.     If PHH wants to make more money, it can negotiate a larger fee from the Holder or master servicer. It should not get to double dip—pocketing the servicing cut while upcharging borrowers for doing the work they have already been paid to do. PHH gets away with these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal. Borrowers are forced to have PHH service their loan.

**C.     PHH Has Long Known that Its Pay-to-Pay Fees Violate Contracts, Laws, and Public Policy But Continues to Manufacture Unfair and Unenforceable Ways to Force Borrowers to Pay Them.**

54.     Pay-to-Pay Fees are nothing new. And they have earned condemnation from borrowers, federal and state legislatures, regulators, and attorneys general. PHH is well aware of the criticisms and unfair and illegal nature of the fees, but has charged them for years. While most mortgage servicers in the country have stopped charging these fees (or never charged them in the first instance) as public outcry over these fees has grown, PHH has looked for new loopholes to force borrowers to continue to pay them.

55.     The federal government and state governments have issued statements condemning Pay-to-Pay Fees and prohibiting loan servicers and debt collectors from assessing them.

56.    In October 2022, President Biden announced that his administration would be taking steps to go after unfair "junk fees" that are imposed on consumers, who get nothing of value in return. Around that time, the Federal Trade Commission announced that it was seeking comments on "junk fees," the "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (last accessed Feb. 1, 2023). Among the junk fees on which the FTC sought commentary were those imposed on "captive consumers," such as those who are dealing with a company that has "exclusive rights." *Id.* Chair Lina M. Khan explained that:

> No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.

*Id.*

57.    Similarly, the Consumer Financial Protection Bureau ("CFPB") has been taking steps to address junk fees. In June 2022, it issued an advisory opinion in which it "affirm[ed]" its position that imposition of "pay-to-pay or 'convenience' fees, such as fees imposed for making a payment online or by phone," where those fees are not contractually or legally authorized, is an "unfair or unconscionable means to collect or attempt to collect any debt" prohibited by Section 808(1) of the FDCPA and the CFPB's regulations implementing that provision. Although the FDCPA may not directly apply in this context, the CFPB's position on Pay-to-Pay Fees affirms the clear federal policy against them in myriad contexts.

58.    This advisory opinion comes on the heels of other efforts by the CFPB to respond to the problems caused by Pay-to-Pay Fees. In October 2021, the CFPB filed an *amicus* brief in a

matter before the Ninth Circuit explaining its position that Pay-to-Pay Fees are junk fees that violate federal law and policy. The CFPB explained:

> The FDCPA was designed to rein in unethical debt collectors, and [the FDCPA] specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

Brief of *Amicus Curiae* Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants at 11, *Thomas-Lawson v. Carrington Mort. Servs.*, No. 21-55459 (9th Cir. filed Oct. 21, 2021), ECF No. 22.

59.    State regulators have also taken action. In April 2022, in response to the CFPB's request for information on this issue, the Attorney General of Illinois led a coalition of 22 state attorneys general, including New York, to call on the CFPB to prohibit mortgage servicers from charging Pay-to-Pay fees. While the CFPB had asked for information on a broad array of "junk fees" charged by financial service companies, the group submitted comments solely on the Pay-to-Pay Fees charged by mortgage servicers. *See* Ex. D, Attorney Generals' Response dated April 11, 2022. The group noted that the fees are particularly problematic in this specific context, explaining "And since mortgage borrowers are a captive market for their particular servicer, borrowers can't simply avoid the fees by taking their business elsewhere." *Id.* at 2. In the comments, the coalition specifically cited PHH as an example of a servicer with unfair Pay-to-Pay

fees. *Id.* at 2, n. 3. Speaking about his reasoning for leading the charge, Illinois Attorney General Kwame Raoul stated "That consumers should face additional charges depending on how they pay their bills, for instance by paying online, is absurd. Convenience fees allow mortgage servicers to be paid twice, for simply performing their most basic function of accepting payments." *See* https://illinoisattorneygeneral.gov/pressroom/2022_04/20220411b.html, last accessed Feb. 22, 2023.

60.     PHH, which is a fully owned subsidiary of Ocwen Financial Corporation, has also been sued by borrowers in various class action lawsuits in several different states over illegal charging of Pay-to-Pay Fees. These lawsuits include:

a.     *Torliatt v. Ocwen Loan Servicing, LLC*, Case No. 3:19-cv-04303 (N.D. Cal.) ("*Torliatt*")

b.     *Williams v. PHH Mortg. Corp.*, Case No. 4:20-CV-04018 (S.D. Tex.) ("*Williams*")

c.     *Thacker v. PHH Mortgage Corporation*, Case No. 5:21-cv-00174 (N.D. W.Va.) ("*Thacker*")

d.     *Morris v. PHH Mortgage Corporation*, Case No. 0:20-cv-60633 (S.D. Fla.) ("*Morris*")

e.     *McWhorter v. Ocwen Loan Servicing, LLC*, Case No. 2:15-cv-01831 (N.D. Ala.) ("*McWhorter*")

61.     *Torliatt*, *Williams*, *Thacker*, *Morris*, and *McWhorter* are referred to herein as "Other Class Lawsuits." In *Torliatt*, the district court certified a class of California borrowers, *see Torliatt v. Ocwen Loan Servicing, LLC*, 570 F. Supp. 3d 781 (N.D. Cal. 2021), and in both *Torliatt* and *Thacker*, PHH settled, agreeing not to charge fees to borrowers in those states. Those settlements

have been finally approved. PHH and/or its parent Ocwen also agreed to settle the *McWhorter*, *Morris*, and *Williams* lawsuits, although it did not agree to stop charging the Pay-to-Pay Fees in those lawsuits. The *McWhorter* settlement has been finally approved, the Southern District of Florida preliminarily approved the *Morris* settlement on December 22, 2022, and the motion for preliminary approval is pending in the *Williams* lawsuit.

62.    Despite being sued, PHH has tried to use class action litigation against it to force borrowers to accept its illegal fees, unsuccessfully in *Morris*, but successfully in *McWhorter*. Specifically, under the terms of the settlement reached in *McWhorter*, the settlement class members were entered into a mass amendment of their mortgage notes to authorize PHH to charge Pay-to-Pay Fees going forward. (The enforceability of these note amendments are questionable in light of the statute of frauds and other legal and policy considerations.)

63.    In *Morris*, in late 2020, PHH and the plaintiff's attorney there reached an agreement similar to that in *McWhorter*, whereby tens of thousands of class members would have their notes amended to authorize the fees. But in January 2021, a coalition of 33 state attorneys general, including those representing Illinois and New York, intervened to object to this settlement in large part because of the note amendment. The New York Attorney General, speaking for the coalition, condemned the fees as unlawful:

> "When Americans utilize online or phone payments to pay off their monthly mortgages, [mortgage servicer] PHH benefits, but instead of passing those savings on to homeowners PHH charged illegal fees and increased costs for nearly one million Americans," said Attorney General James. "PHH's sole purpose is to collect and process homeowners' payments, which it already makes millions of dollars from each year. In the 21st century, when most Americans pay their bills online or by phone, to charge fees on top of what they are already being paid is not only unethical, but unlawful."
>
> For years, PHH charged nearly one million homeowners an illegal fee—ranging from $7.50 to $17.50—each time a homeowner made a monthly mortgage payment online or by phone, despite most Americans paying their mortgages one of these two ways. Nowhere in

these homeowners' mortgage contracts is there authorization for such fees and PHH does not charge "processing" fees for any other customers, including those who pay by check or those who set up automatic debit payments. Charging fees not mentioned in the mortgage contract is illegal and, under New York's mortgage servicing regulations, explicitly forbidden.

Press Release, N.Y. State Att'y Gen., *Attorney General James Leads Bipartisan Coalition Fighting to Protect Nearly One Million Homeowners from Unlawful Fees* (Jan. 29, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-leads-bipartisan-coalition-fighting-protect-nearly-one.

64.    Likewise, the office of Illinois Attorney General Kwame Raoul issued a press release decrying the "illegal payment processing fees" and taking issue with the fact that the servicer would be permitted "to profit from unethical and illegal conduct." Press Release, Ill. Att'y Gen., *Attorney General Raoul Fights to Protect Homeowners for Unlawful Fees* (Jan. 29, 2021), https://illinoisattorneygeneral.gov/pressroom/2021_01/20210129.html#:~:text=For%20years%2C%20PHH%20charged%20nearly,one%20of%20these%20two%20ways.

65.    The *Morris* court ultimately denied preliminary approval, refusing to allow PHH to amend tens of thousands of notes via settlement, and the revised settlement, which was preliminarily approved, does not contain any such provision. Since then, however PHH has continued to find ways to force borrowers to pay these fees.

66.    In recent months, in Illinois and likely in other states, PHH has started informing borrowers who try to elect PHH's standard EFT option that a "signed amendment to the original Note document" is required. *See, e.g.*, Ex. C. The proposed amendment purports to require the borrower to agree to pay up to $19.50 for use of "any payment methods not specifically provided for by the Note." *Id.* at p. 3, ¶ 2. Because the original mortgage agreement, including the note, only specifically provides for payment via check or money order, PHH would be permitted to charge

24

any borrower who signed this amendment $19.50 a month for all types of payments not specified in the original agreement, including pre-authorized EFT transactions, and it would be permitted to do so for the remaining duration of the mortgage agreement.

## PLAINTIFFS' ALLEGATIONS

### A.    Plaintiff Jones

67.    On or around June 29, 2021, Plaintiff Jones obtained a mortgage loan secured by her home in Amherst, New York. Plaintiff Jones executed a promissory note ("Plaintiff Jones Note") and mortgage ("Plaintiff Jones Mortgage") (collectively "Plaintiff Jones Standard Mortgage Agreement") consistent with the Standard Mortgage Agreement with FHA modifications. The Plaintiff Jones Note and Plaintiff Jones Mortgage are attached as Exhibit A..

68.    Plaintiff Jones obtained the mortgage loan secured by her property for personal, family or household uses.

69.    Plaintiff Jones's Lender and/or master servicer assigned PHH servicing rights under her Standard Mortgage Agreement. At no time was Plaintiff Jones provided an opportunity to select her servicer; rather, the decision to assign PHH servicing rights was made exclusively by her lender and/or master servicer.

70.    Like many other borrowers whose mortgages are serviced by PHH, Plaintiff Jones's Standard Mortgage Agreement incorporates standard language from Fannie Mae and Freddie Mac model mortgages, with the standard FHA modifications. Like those other borrowers, Plaintiff Jones Standard Mortgage Agreement does not expressly authorize Pay-to-Pay Fees, and limits PHH's ability to collect the fees to those authorized by HUD, and prohibits lenders from charging fees prohibited by law, including the law of New York. Section 13 of Plaintiff Jones Mortgage provides, in relevant part:

13. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. *Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.*

Emphasis added.

71.    Plaintiff Jones paid her payments via standard EFT placed over the phone or internet every month since origination including but not limited to, the months of July and November 2022. Each time she did, PHH charged her a Pay-to-Pay Fee. For example, on July 12, 2022, and November 9, 2022, PHH collected from Plaintiff Jones $7.50 in Pay-to-Pay Fees for her standard EFT payments.

72.    Each Pay-to-Pay Fee charged by PHH to process Plaintiff Jones' standard EFT payments grossly exceeded PHH's costs of accepting the EFT payment. Each fee was neither reasonably related to PHH's costs of providing the service, nor customary in the industry. Plaintiff Jones would prefer to use one of the many servicers who does not charge Pay-to-Pay Fees for routine EFT payments, but is not able to change servicers.

**B.    Plaintiff Allard**

73.    On or around October 4, 2005, Plaintiff Allard obtained a mortgage loan secured by her home in Chatham, Illinois. Plaintiff Allard executed a promissory note ("Plaintiff Allard Note") and mortgage ("Plaintiff Allard Mortgage") (collectively "Plaintiff Allard Standard Mortgage Agreement") consistent with the Standard Mortgage Agreement. The Allard Mortgage is attached as Exhibit B.

74.    Plaintiff Allard obtained the mortgage loan secured by her property for personal, family or household uses.

26

75.     Plaintiff Allard's Lender and/or master servicer assigned PHH servicing rights under the mortgage agreement. At no time was Plaintiff Allard provided an opportunity to select her servicer; rather, the decision to assign PHH servicing rights was made exclusively by her lender and/or master servicer.

76.     Like many other borrowers whose mortgages are serviced by PHH, Plaintiff Allard's Standard Mortgage incorporates standard language from Fannie Mae and Freddie Mac model mortgages. Like those other borrowers, Plaintiff Allard's Standard Mortgage Agreement does not expressly authorize Pay-to-Pay Fees. Section 14 of Plaintiff Allard's Mortgage provides, in relevant part:

> **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protection of Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

77.     Plaintiff Allard paid her payments via standard EFT over the internet for most, if not all months, over the last three years. Each time she did, PHH charged her a Pay-to-Pay Fee. For example, on July 28, 2022, PHH collected from Plaintiff Allard a $7.50 Pay-to-Pay Fee for her standard EFT payment.

78.     Each Pay-to-Pay Fee charged by PHH to process Plaintiff Allard's standard EFT payments grossly exceeded PHH's costs of accepting the EFT payment. Each fee was neither reasonably related to PHH's costs of providing the service, nor customary in the industry. Plaintiff Allard would prefer to use one of the many servicers who does not charge Pay-to-Pay Fees for routine EFT payments, but is not able to change servicers.

79.     Plaintiff Allard has an outstanding fee of $15.00 on her mortgage account. When Plaintiff Allard logs on to PHH's website to make her monthly payment, Plaintiff Allard has the option to click one link that allows her to pay her monthly payment or additional principal, or another link that allows her to pay any outstanding fees on the account. However, PHH will not allow her to process the payments together. As such, if Plaintiff Allard wanted to pay her monthly payment and the $15.00 fee, she would have to process two transactions, and thus, pay two $7.50 Pay-to-Pay Fees.

80.     On December 28, 2022, Plaintiff Allard logged on to her PHH online portal to pay her January 1, 2023 mortgage payment. However, she was unable to process the payment and was instructed to call PHH's customer service hotline. When Plaintiff Allard called, she was informed by the PHH representative that to make a phone or internet payment in the future, Plaintiff Allard had to sign a Note Amendment in which she agreed that PHH may "choose to accept payments made through means not specifically provided for in the Note[,]" and that PHH could charge up to $19.50 per payment for those charges. Ex. C, Allard Proposed Note Amendment Agreement ¶1-4. Plaintiff Allard did not sign the amendment or otherwise agree to it. Because Plaintiff Allard's original note did not specifically provide for any form of ETF payment, had PHH secured Plaintiff Allard's signature, Plaintiff Allard risked PHH charging her $19.50 for any form of ETF, pre-authorized or standard, for the remaining 12 years of her mortgage

## C.    Notice was Provided to PHH

81.     On January 24, 2023, Plaintiffs' counsel provided the notice attached as Exhibit E to PHH and demanded it cure the violations on behalf of the putative classes. PHH did not respond.

82.     On numerous occasions, including in connection with each of the lawsuits identified in paragraph 60, PHH has been put on notice that its Pay-to-Pay Fee practices violate

state and federal laws and regulations and the standard mortgage agreements as to its residential borrowers throughout the United States. As a large corporation, PHH is aware of the larger regulatory scheme, and is further aware that state and federal officials have criticized the practice as unfair, illegal, and in contravention of public policy.

83.     Further time and effort to secure compliance with PHH would have been futile, as PHH has refused to modify its practices in light of years of notice, criticism, and demands that it cure, cease the practice, and provide compensation to affected borrowers.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff Jones brings this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of a FHA Class defined as follows:

**FHA Class**: All persons (1) with a residential mortgage loan securing a property in the United States, (2) serviced or subserviced by PHH, (3) with mortgage or deed of trust agreements incorporating standard uniform covenants from FHA model mortgages, (4) and who paid a Pay-to-Pay Fee to PHH when making a payment on their mortgage by telephone, internet, or an Interactive Voice Response system ("IVR") during the applicable statutes of limitations through the date a class is certified.

85.     Plaintiff Jones brings this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of a FHA New York Subclass defined as follows:

**FHA New York Subclass**: All persons (1) with a residential mortgage loan securing a property in the state of New York, (2) serviced or subserviced by PHH, (3) with mortgage or deed of trust agreements incorporating standard uniform covenants from FHA model mortgages, (4) and who paid a Pay-to-Pay Fee to PHH when making a payment on their mortgage by telephone, internet, or IVR during the applicable statutes of limitations through the date a class is certified.

86.     Plaintiff Jones brings this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of the New York Class defined as follows:

**New York Class:** All persons (1) with a residential mortgage loan securing a property in the state of New York, (2) serviced or subserviced by PHH, (3) with mortgage or deed of

trust incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, and (4) and who paid a fee to PHH for making a loan payment by telephone, internet, or IVR, during the applicable statutes of limitations through the date a class is certified.

87.    Plaintiff Allard brings this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of the Illinois Class defined as follows:

> **Illinois Class:** All persons (1) with a residential mortgage loan securing a property in the state of Illinois, (2) serviced or subserviced by PHH, (3) with mortgage or deed of trust incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, and (4) and who paid a fee to PHH for making a loan payment by telephone, internet, or IVR, during the applicable statutes of limitations through the date a class is certified.

88.    Excluded from these classes are borrowers whose loans were modified via the previously approved class action settlement in *McWhorter, et al. v. Ocwen Loan Servicing, LLC, et al.*, No. 2:15-cv-01831-MHH (N.D. Ala.). Further excluded from these classes are claims released by borrowers who were members of the settlement classes in *Torliatt v. Ocwen Loan Servicing, LLC*, Case Nos. 3:19-cv-04303-WHO, 3:19-cv-04356-WHO (N.D. Cal.), *Thacker v. PHH Mortgage Corp.*, No. 5:21-cv-00174-JPB (N.D. W.Va.), *Morris et al. v. PHH Mortgage Corp. et al.*, No. 0:20-cv-60633-RS (S.D. Fla.), *Williams v. PHH Mortg. Corp.*, Case No. 4:20-CV-04018 (S.D. Tex.)(settlement pending preliminary court approval). Further excluded from these classes are PHH, any entity in which PHH has or had a controlling interest or which have or had a controlling interest in any PHH, PHH's employees, officers, directors, legal representatives, assigns, and successors; the judicial officer(s) to whom this matter is assigned and their immediate family; and Class members who timely opt-out of any certified 23(b)(3) opt-out Class.

89.    Plaintiffs reserve the right to modify or amend the definition of the Classes before the Court determines whether certification is appropriate.

**A.    Numerosity (Rule 23(a)(1))**

90.    The proposed Classes are so numerous that joinder of all members would be impracticable; PHH services hundreds of thousands of loans. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by PHH. The precise number of Class members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**B.    Commonality (Rule 23(a)(2))**

91.    There are core questions of law and fact that are common to Plaintiffs' and Class members' claims.

92.    These common questions predominate over any questions that go particularly to any individual member of the Classes. Among such common questions of law and fact are the following:

a.    whether Class members' loan agreements prohibited Pay-to-Pay Fees;

b.    whether PHH was in near functional privity or privity of contract with Class members;

c.    whether PHH was operating as an agent for its lender / note holder / trustee principals;

d.    whether PHH charged Class members Pay-to-Pay Fees;

e.    whether the Pay-to-Pay Fees were in excess of the actual cost of the fees, *i.e.*, the costs and charges incurred by PHH to accept mortgage payments by EFT;

31

f.    whether PHH breached Class members' loan agreements and violated state and federal law;

g.    whether PHH's cost to process Pay-to-Pay transactions is less than the amount that it charged for Pay-to-Pay Fees;

h.    whether Plaintiffs and the Classes were damaged by PHH's conduct;

i.    whether Plaintiffs and the Classes are entitled to restitution;

j.    whether Plaintiffs and the Classes are entitled to attorney's fees and costs; and

k.    the appropriate remedies due by PHH to Class members.

**C.    Typicality (Rule 23(a)(3))**

93.    Plaintiffs are members of the Classes they seek to represent. Plaintiffs' claims are typical of claims of the other Class members because of the similarity, uniformity, and common purpose of PHH's unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of PHH's unlawful conduct.

**D.    Adequacy of Representation (Rules 23(a)(4) and 23(g))**

94.    Plaintiffs are adequate representatives of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

95.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, who are experienced in class action litigation, fraud litigation, and mortgage litigation, and who have the

financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**E.    Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))**

96.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed Class members are based on PHH's common fraudulent and unlawful conduct based on uniform policies involving standardized (and form) mortgage documents.

97.    Moreover, common questions of law predominate, including whether the assessment of Pay-to-Pay Fees violates the mortgage agreements and are assessed in bad faith.

98.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

99.    A class action is superior to individual actions.

100.    Joinder of all Class members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

101.    Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

102.    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions. The interests of justice will be well served by resolving the common disputes of potential Class members in one forum. Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

**F.    Requirements of Fed. R. Civ. P. 23(b)(2)**

103.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Classes.

104.     PHH acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT

### (On Behalf of Plaintiff Jones, the FHA Class, the FHA New York Subclass, and the New York Class)

105.     Plaintiff Jones incorporates paragraphs 1 through 104 as if fully set forth herein.

106.     Plaintiff Jones and the other members of the FHA Class, the New York Class, and the FHA New York Subclass (collectively "Breach Classes") have executed Standard Mortgages, with all members of the FHA and New York FHA Subclass having additional FHA modifications.

107.     Plaintiff Jones and all members of the Breach Classes have loans serviced by PHH. In cases where PHH purchased the servicing rights and/or took assignment of those servicing obligations under the mortgage or deed of trust agreements, PHH is in privity with the borrowers of each class. In cases where PHH services the loans as an agent for the lender/master servicer or GSE, PHH is in functional privity or near privity of contract with Plaintiff Jones and the members of the Breach Classes as a result of its fulfillment of its principals' duties and obligations running from these Class members' loan agreements, including but not limited to: (i) the collection of all monies due under those loan agreements; (ii) preparing and transmitting monthly statements concerning those loan agreements; (iii) performing all or nearly all customer service functions

concerning those loan agreements; (iv) engaging in written and oral communications concerning those loan agreements; (v) enforcing their principals' rights of foreclosure under the loan agreements.

108.    Conceding the assignment of its powers to act as its principals' agents and near-privity relationships with Plaintiff Jones, and the members of the FHA Class, PHH stated in communications to them that "PHH Mortgage Services will perform all servicing activities for your mortgage loan." As to all members of the Breach Classes, their Standard Mortgage Agreements provide that the covenants and agreements bind the successors and assigns of the lender. *See, e.g.,* Ex. A ¶ 12. PHH thus became bound as an assignee of the mortgage agreements at the time it acquired the servicing rights to the subject mortgage loan.

109.    By virtue of its acquisition of servicing rights via purchase and/or assignment, PHH stands in the shoes of the "Lender" in the Standard Mortgage Agreements in which all Breach Class members entered, and both enjoys the rights and must adhere to the obligations of those Agreements.

110.    PHH breached the terms of the FHA Standard Mortgages by imposing Pay-to-Pay Fees on Plaintiff Jones and the Breach Classes in at least one of two ways.

**On Behalf of the FHA Class (including the New York FHA Subclass)**

111.    As to the FHA Class, the uniform covenants of FHA Standard Mortgages state that the "*Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.*"

112.    The only fees authorized by the Secretary of HUD appear in the Approved Fee Regulation at 24 C.F.R. § 203.552. That regulation further requires that "mortgagees," which

covers PHH as servicer, can collect "reasonable and customary fees and charges . . . only as provided" in the regulation.

113.    Pay-to-Pay Fees are not identified among the types of charges approved in 24 C.F.R. § 203.552. Nor are they identified in implementing policy documents, including Appendix 3 of the HUD Servicing Policy. *See* HUD Servicing Policy § III(A)(1)(f).

114.    In fact, HUD's regulations specifically provide that "[c]harges for servicing activities of the mortgagee or servicer" "*shall not*" be authorized by HUD as "reasonable and customary charges." 24 C.F.R. § 203.552(a)(12)(i) (emphasis added). And HUD prohibits servicers from charging the borrower for "activities that are normally considered a part of a prudent Mortgagee's servicing activity." *Id.* § III(A)(1)(f)(C).

115.    The Pay-to-Pay Fees charged to Plaintiff Jones and the FHA Class are charges for PHH's servicing activity, as PHH's servicing work is to accept and process payment.

116.    The Pay-to-Pay Fees charged to Plaintiff Jones and the FHA Class are further not reasonable, as they far exceed the cost to accept payment via standard EFT, nor are they customary, as many mortgage servicers do not charge for this service.

117.    Because Pay-to-Pay Fees are not "authorized by the Secretary," PHH breached the terms of the Standard Mortgages by collecting them.

## On Behalf of the New York Class

118.    The Standard Mortgage Agreements in use by the New York Class all require compliance with Applicable Law and prohibit the assessment of fees in violation of applicable law. *See, e.g.,* Ex. A, § 13, 15, and 19. Applicable law includes state laws and regulations.

119.    New York law regulating the conduct of mortgage loan servicers provides that "[a] servicer may only collect a fee if it is for a service that is actually rendered to the borrower,

reasonably related to the cost of rendering that service," and otherwise satisfies additional criteria. 3 N.Y.C.R.R. § 419.5(b). This law governs the conduct of servicers in New York.

120.    PHH is a servicer within the meaning of 3 N.Y.C.R.R. § 419.1(l). In charging fees each time a borrower elects to pay via a standard EFT, PHH collects a fee for a service. PHH's steep fees of $7.50 to $19.50 are not reasonably related to the cost of rendering that service; rather, its costs are significantly less.

121.    By imposing Pay-to-Pay Fees in violation of 3 N.Y.C.R.R. § 419.5(b) on the New York Class, PHH breached the terms of the Standard Mortgage Agreements, which prohibiting it from assessing fees that are prohibited by applicable law.

122.    Plaintiff Jones and the Breach Class members have been damaged as a direct result of PHH's breaches of contract. Those damages comprise the wrongful imposition and collection of Pay-to-Pay Fees from Plaintiff Jones and the Breach Class members.

123.    Plaintiff Jones and the Breach Class members were each making payments on their loans at the time the Pay-to-Pay Fees were charged, and were at all relevant times otherwise in compliance with and not in breach of their Standard Mortgages and other loan agreements, or alternatively, PHH elected its remedy to continue to perform under those loan agreements even after asserting a breach by Plaintiff Jones and other members of the Classes.

124.    Because the above provisions are contained in the "Uniform Covenants" section of the Standard Mortgages, PHH has breached their contracts on a Class-wide basis as to the members of all Breach Classes.

125.    As a result of PHH's breaches of contract, Plaintiff Jones and the Breach Class members seek actual damages, equitable remedies including declaratory relief, an injunction,

disgorgement, restitution, and imposition of a constructive trust, in addition the payment of attorneys' fees and reasonable expenses.

## COUNT II

## VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

**(On Behalf of Plaintiff Jones, the FHA Class, the FHA New York Subclass, and the New York Class)**

126.    Plaintiffs incorporate paragraphs 1 through 125 as if fully set forth herein.

127.    Plaintiffs Jones and the other members of the Breach Classes have executed Standard Mortgages for loans serviced by PHH.

128.    In cases where PHH purchased the servicing rights and/or took assignment of those servicing obligations under the mortgage or deed of trust agreements, PHH is in privity with the borrowers.

129.    In cases where PHH services the loans as an agent for the lender/primary servicer or GSE, PHH is in functional privity or near privity of contract with Plaintiff Jones and Breach Classes members as a result of its fulfillment of its principals' duties and obligations running from Plaintiff Jones's and Breach Classes members' loan agreements, including but not limited to: (i) the collection of all monies due under those loan agreements; (ii) preparing and transmitting monthly statements concerning those loan agreements; (iii) performing all or nearly all customer service functions concerning those loan agreements; (iv) engaging in written and oral communications concerning those loan agreements; (v) enforcing the principals' rights of foreclosure under the loan agreements.

130.    Conceding the assignment of its powers to act as its principals' agents and near-privity relationships with Plaintiff Jones and Breach Classes members, PHH stated in

communications to Plaintiff Jones and Breach Classes members that "PHH Mortgage Services will perform all servicing activities for your mortgage loan."

131.    A covenant of good faith and fair dealing is implied in every contract, including the standard form mortgage agreements serviced and administered by PHH. This covenant imposes upon each party a duty of good faith and fair dealing in the performance of the contract.

132.    Where an agreement affords one part the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

133.    PHH has breached its obligations of good faith and fair dealing by abusing the discretion afforded by Plaintiff Jones' and Breach Classes members' Standard Mortgages by imposing improper Pay-to-Pay Fees.

**On Behalf of the FHA Class (including the New York FHA Subclass)**

134.    As to the FHA Class, the FHA regulatory scheme and uniform covenants of FHA Standard Mortgages dictate that the PHH "may collect fees and charges authorized by the Secretary" and is prohibited from charging a borrower a fee for "activities that are normally considered part of a prudent Mortgagee's servicing activity." 24 C.F.R. § 203.552(a)(12)(i).

135.    PHH breached its obligation of good faith and fair dealing by abusing its discretion under the terms of the FHA Classes members' Standard Mortgages by imposing the improper Pay-to-Pay Fees as they are not authorized by the Secretary of HUD, and the fees are for the collection of payments, which is an activity that is normally considered part of a prudent mortgagee's servicing activity.

**On Behalf of the New York Class (including the FHA Subclass)**

136.    As to the New York Class, the Standard Mortgages in use by the New York Class all require compliance with Applicable Law and prohibit the assessment of fees in violation of Applicable Law. New York law provides "[a] servicer may only collect a fee if it is for a service that is actually rendered to the borrower, reasonably related to the cost of rendering that service," and otherwise satisfies additional criteria. 3 N.Y.C.R.R. § 419.5(b).

137.    PHH breached its obligation of good faith and fair dealing by abusing its discretion under the terms of Standard Mortgages by imposing the improper Pay-to-Pay Fees as PHH's steep fees of $7.50 to $19.50 are not reasonably related to the cost of rendering the processing of a standard EFT payment as its costs are significantly less.

138.    As a direct and proximate result of the aforementioned breaches of the covenant and duties of good faith and fair dealing, Plaintiff Jones, and the members of the Breach Classes have suffered damages.

139.    Plaintiff Jones and the other members of the Breach Classes were each making payments on their loans at the time the Pay-to-Pay Fees were charged, and were at all relevant times otherwise in compliance with and not in breach of their Standard Mortgages and other loan agreements, or alternatively, PHH elected its remedy to continue to perform under those loan agreements even after asserting a breach by Plaintiff Jones, and other members of the Breach Classes.

140.    As a result of PHH's breach of the covenant and duties of good faith and fair dealing, Plaintiff Jones and the FHA Class, FHA New York Subclass, and New York Class seek actual damages, equitable remedies including an injunction, disgorgement, restitution and imposition of a constructive trust, in addition the payment of attorneys' fees and reasonable expenses.

## COUNT III

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

### (On Behalf of Plaintiff Jones and the FHA New York Subclass and New York Class)

141.    Plaintiffs incorporate paragraphs 1 through 140 as if fully set forth herein.

142.    Plaintiff Jones brings this cause of action for violations of GBL § 349 individually and on behalf of the New York Class (including the New York FHA Subclass).

143.    Plaintiff Jones and New York Class members are "persons" within the meaning of GBL § 349(h).

144.    GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

145.    In assessing Pay-to-Pay Fees on Plaintiff Jones and members of the New York Class, PHH deceived Plaintiff Jones and class members into believing the assessment of such fees was lawful in at least one of two ways.

146.    As to the New York Class, New York law, specifically, 3 N.Y.C.R.R. § 419.5(b), prohibits mortgage servicers from collecting fees for services when those fees are not "reasonably related to the cost of rendering that service." In collecting Pay-to-Pay Fees that were not reasonably related to the cost of accepting and processing EFT transactions, and in advertising and accepting payment for the service, PHH deceived members of the New York Class into believing that it had the legal authority to charge Pay-to-Pay Fees when it did not. As to all New York Class members, PHH omitted that its collection of Pay-to-Pay Fees violated New York law.

147.    As to the New York FHA Class, federal regulations, including the Approved Fee Regulation at 24 C.F.R. § 203.552, require that PHH, as a "mortgagee" refrain from collecting fees not authorized by the Secretary of HUD and collect only those fees specifically approved by the

Secretary of HUD. As an approved FHA mortgagee, PHH only has the legal authority to collect the fees identified in the Approved Fee Regulation. Pay-to-Pay Fees have not been authorized by HUD, are prohibited fees for PHH's servicing activities, and are not otherwise reasonable and customary fees within the meaning of that regulation. In collecting Pay-to-Pay Fees that were not approved, not reasonable, not customary, and otherwise excluded from the types of fees that HUD may approve, and in advertising and accepting payment for the service, PHH deceived members of the New York FHA Class into believing that it had the legal authority to charge Pay-to-Pay Fees when it did not. As to all New York Class members, PHH omitted that its collection of Pay-to-Pay Fees violated HUD regulations.

148.     Because of PHH's misrepresentations and omissions regarding its legal authority to collect Pay-to-Pay Fees, Plaintiff Jones and the members of the New York Class, including the FHA Class, were deceived into paying Pay-to-Pay Fees and/or paid those Fees at a premium (such as the amount in excess of a cost reasonably related to the provision of the service).

149.     PHH's conduct is deceptive because it is likely to mislead consumers and the public by making them believe, falsely, that PHH had the legal authority to impose and collect Pay-to-Pay Fees.

150.     PHH's misrepresentations were materially false and misleading and likely to deceive the consuming public because PHH knew, or reasonably should have known, and failed to disclose, that it was not permitted to impose or collect Pay-to-Pay Fees.

151.     The deceptive acts and practices of PHH have directly, foreseeably, and proximately caused damages and injury to Plaintiff Jones, FHA New York Subclass members, and New York Class members.

152.    In addition to pecuniary losses, Plaintiff Jones, FHA New York Subclass members, and New York Class members suffered actual harm as a result of PHH's violations GBL § 349(a) and other consumer protection statutes, including but not limited to, the annoyance, harassment, time, frustration, anger, and anxiety due to PHH's deceptive acts and practices.

153.    Plaintiff Jones, FHA New York Subclass members, and New York Class members are entitled to pursue claims against PHH for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL § 349(h) to redress PHH's violations of GBL § 349(a).

154.    New York Class members who were sixty-five years of age or older at the time of PHH's violations of GBL § 349 are entitled to pursue additional remedies pursuant to GBL § 349-c to redress PHH's violations of GBL § 349(a) perpetrated against elderly persons.

## COUNT V

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (On Behalf of Plaintiff Allard and the Illinois Class)

155.    Plaintiffs incorporate paragraphs 1 through 104 as if fully set forth herein.

156.    The ICFA prohibits "unfair or deceptive acts or practices." 815 Ill. Comp. Stat. 505/2.

157.    An act or practice is "unfair" if it offends public policy, if it is immoral, unethical, oppressive, or unscrupulous, or if it causes substantial injury to consumers.

158.    PHH's use of its exclusive position as the mortgage servicer for captive borrowers like Plaintiff Allard's and class member's to impose Pay-to-Pay Fees to which it is neither entitled by law to add nor expressly authorized by the Standard Mortgages constitutes a "unfair" business

practice because, as alleged above, it offends established federal and Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, and have resulted in substantial injuries to consumes.

159.    The State of Illinois's actions in various contexts demonstrate that Pay-to-Pay Fees offend established public policy. For example, Illinois has enacted statutory and administrative rules prohibiting the imposition of processing or service fees not authorized by law or the agreement during the collection of consumer debts. *See* 720 Ill. Comp. Stat. 5/17-5(c) (prohibits "add[ing] to the debt any service charge . . . which he, she, or it is not entitled by law to add" while attempting to collect an alleged debt.; 225 Ill. Comp. Stat. 425/9(a)(33) (authorizing disciplinary proceedings against a "collection agency" for "[c]ollecting or attempting to collect any interest or other charge or fee in excess of the actual debt unless such interest or other charge or fee is expressly authorized by the agreement creating the debt unless expressly authorized by law…"). Illinois law also prohibits mortgage servicers from "knowingly misrepresent[ing], circumvent[ing] or conceal[ing], through whatever subterfuge or device, any of the material particulars or the nature thereof, regarding a transaction to which it is a party to the injury of another party thereto[.]" 205 Ill. Comp. Stat. Ann. 635/2-4(k). The Illinois Attorney General further articulated Illinois's public policy against Pay-to-Pay Fees with the unequivocal statement that they are "unethical and illegal."

160.    Federal public policy also disfavors Pay-to-Pay Fees. This policy is reflected in, among other things, CFPB statements and advisory opinions, the statements of the executive branch, and Congress's prohibition in the FDCPA on debt collectors assessing Pay-to-Pay Fees.

161.    PHH is neither entitled by law to add nor expressly authorized by Plaintiff Allard's and Illinois Class members' Standard Mortgages to collect Pay-to-Pay Fees. By assessing Pay-to-Pay Fees, PHH represented that the mortgage debts of Plaintiff Allard and Illinois Class members

may be increased by the addition of the Pay-to-Pay Fees, even though Pay-to-Pay Fees may not be legally added to the existing obligation and are not authorized by their Standard Mortgages. PHH likewise omitted that these Pay-to-Pay Fees are not authorized by law or borrowers' Standard Mortgages.

162.    PHH's practice of charging Pay-to-Pay Fees not authorized by Standard Mortgages or applicable law is immoral, unethical, oppressive, and unscrupulous. Under the ICFA, conduct is oppressive when it leaves a consumer with little alternative except to submit to it, and the consumer cannot avoid the defendant's practice by seeking an alternative elsewhere. PHH's conduct is oppressive because borrowers cannot choose another loan servicer or shop around for a better deal to avoid PHH's imposition of unlawful Pay-to-Pay Fees. And as set forth in Paragraph 42, payment via mail or ACH is impractical. Borrowers are forced to have PHH as their loan servicer as a result of the unilateral decision of their lender or holder of their note. If borrowers had their choice, they could select one of the many other mortgage servicers that do not charge a fee for a standard EFT.

163.    PHH's unfair practices are substantially injurious to consumers, who were and are forced to pay a "processing" or "convenience" fee each time they make payments by phone or online. In aggregate, the charging of these illegal fees has resulted in millions of dollars of harm to Illinois borrowers.

164.    There is no countervailing benefits to consumers or competition that outweighs the harm suffered by Plaintiff Allard and the Illinois class as PHH charges fees well above the actual cost of providing online and phone payment services, and doing so gives PHH an unfair advantage over its competitors who do not charge the unlawful fees. The unlawful profit center gives PHH the opportunity to undercut its competitors by accepting a lower servicing fee, providing more

robust services for the same servicing fee, distributing more dividends to its shareholders, or any combination thereof. This will incentivize competitors to engage in a race to the bottom to reduce costs – likely in the form of the reducing the number of employees, or decreasing or delaying technological investment -- or increase their revenue by instituting their own unlawful fees. Either scenario, or combination thereof, is detrimental to consumers and competition.

165.    PHH intended for Plaintiff Allard and the Illinois Class members to rely on its unfair practices, which they did when they paid the illegal fees.

166.    PHH's unfair practices occurred during the course of conduct involving trade or commerce as PHH was servicing consumer mortgages for residential properties in Illinois.

167.    As a result of the above conduct, Plaintiff Allard and Illinois Class members have suffered actual economic damages in the form of unlawful Pay-to-Pay Fees that they should not have been required to pay. As such, Plaintiff Allard requests that the Court award actual and punitive damages to the full extent provided by law, enjoin PHH from continuing to violate the ICFA in the future, and any other relief which the Court deems proper pursuant to 815 Ill. Comp. Stat. 505/10a.

## COUNT VI

## UNJUST ENRICHMENT

**(On Behalf of Plaintiff Jones, Plaintiff Allard, and the FHA Class, FHA New York Subclass, New York Class and the Illinois Class)**

168.    All prior and subsequent paragraphs are hereby incorporated by reference.

169.    Plaintiffs and the Class members conferred benefits on PHH. Namely, Plaintiffs and the Class members paid Pay-to-Pay Fees to PHH.

170.    PHH's retention of these benefits is unjust because PHH had no right to collect the Pay-to-Pay Fees under the Standard Mortgages or applicable law.

171.    Plaintiffs and the Class members are entitled to restitution and PHH is required to disgorge the benefits it unjustly obtained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    An order certifying the proposed classes pursuant to Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent them;

2.    Monetary and/or equitable relief in an amount to be determined at trial;

3.    Statutory damages and/or penalties, including treble damages;

4.    Punitive or exemplary damages;

5.    Pre- and post-judgment interest to the extent provided by law;

6.    Attorneys' fees and costs of suit, including costs of notice, administration, and expert fees; and

7.    Such other legal or equitable relief, including injunctive or declaratory relief, as the Court may deem appropriate.

## PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.


Dated: February 22, 2023                    Respectfully submitted,

                                            */s/ Patricia M. Kipnis*_____
                                            Patricia M. Kipnis, Esq. (NJSB #016962003)
                                            BAILEY GLASSER LLP
                                            1622 Locust Street
                                            Philadelphia, PA 19102
                                            Tel. (215) 274-9331
                                            pkipnis@baileyglasser.com

Hassan A. Zavareei*
Kristen G. Simplicio*
Peter Silva*
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Ave NW, Suite 1010
Washington, D.C. 20006
Tel.: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
ksimplicio@tzlegal.com
psilva@tzlegal.com

***Attorneys for Plaintiff***

\* *pro hac vice* applications to be filed